```
                 IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

                 Plaintiff,
     vs.                                Case No. 09-40050-01-RDR

RYAN A. PETERSON,

                 Defendant.
```

### MEMORANDUM AND ORDER

Defendant is charged with attempting to murder a person named Joshua Webber on the Fort Riley Military Reservation. This case is before the court upon defendant's motion to suppress statements he made under custodial interrogation. The court has conducted an evidentiary hearing upon the motion and, after careful consideration, shall deny defendant's motion.

Factual background

Defendant is 29 years old. He has worked most recently as a mechanic at a farm implement business. Defendant is from Ipswich, South Dakota. He drove from South Dakota through the night to Fort Riley, near Junction City, Kansas. He arrived at Fort Riley on May 22, 2009. Defendant was arrested on Fort Riley in the late morning hours and interrogated while in custody. Defendant was informed of his Miranda rights twice. First, Officer Keith Cosimini informed defendant of his Miranda rights orally and in writing. This occurred at about 12:09 p.m. The written warning includes the

following statements:

> The investigator . . . told me that he/she is with the United States Army Fort Riley Police Department and wanted to question me about the following offense(s) of which I am suspected: attempted burglary, criminal use/possession of a weapon, fleeing from police. Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:
> 1.  I do not have to answer any questions or say anything.
> 2. Anything I say or do can be used as evidence against me in a criminal trial.
> 3. (*For personnel subject to the UCMJ*) I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning.  This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me or both.
> - or -
> (*For civilians not subject to the UCMJ*) I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning.  I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins.
> 4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time or speak privately with a lawyer before answering further, even if I sign the waiver below.
> . . . .
> I understand my rights as stated above.  I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

Defendant signed below the last statement indicating that he was waiving his right to silence and the other above-mentioned rights. His signature was witnessed by Officer Cosimini.  Defendant also wrote "yes" and his initials by each enumerated statement.  He wrote "yes" and placed his initials by the second part of statement

three regarding the right to appointed counsel "for civilians not subject to the UCMJ." Officer Cosimini read this part of statement three to defendant as well as the rest of the warnings.

Officer Cosimini testified that defendant appeared relaxed and attentive. Defendant was cooperative and spoke in a coherent conversational tone to Officer Cosimini. Officer Cosimini denied that any promises or threats were made to defendant. Defendant was not in handcuffs or any other kind of restraints. Defendant appeared sober. He was not scared or upset according to Officer Cosimini, who was a credible witness in the court's judgment. After interviewing defendant for ten or fifteen minutes, Officer Cosimini turned defendant over to be interviewed by Detective James Greer. He told Detective Greer that defendant had waived his Miranda rights.

There is a video recording of Detective Greer's interrogation of defendant, but no recording of Officer Cosimini's interrogation.

The court has reviewed the recording of Detective Greer's interrogation of defendant. Defendant was in a small room with Detective Greer. A few times, more than one officer was in the room. The officers carried weapons. Defendant did not appear physically intimidated or threatened by the officers or their weapons. Most of the time, Detective Greer used a friendly or counseling tone. Occasionally Detective Greer raised his voice. He frequently cursed, sometimes congenially and sometimes to

emphasize a serious intention. Detective Greer often accused defendant of lying. Toward the beginning of his interrogation, Detective Greer told defendant that Greer was a federal officer and that it was a felony to lie to a federal officer. Many of Detective Greer's comments thereafter seemed to be couched in the context that defendant should not lie to Greer or that defendant should amend his statements to be more truthful because that might lessen the chance of criminal liability for lying to a federal officer. Detective Greer also "counseled" defendant at various times that, like an alcoholic, defendant needed to admit his problem so that he could receive treatment. Approximately thirty minutes into Detective Greer's interrogation, he told defendant that there were two types of punishment - - more severe punishment for those who do not cooperate and lighter punishment for those who do cooperate.

Detective Greer said that the interrogation would continue or that defendant would spend more time with Greer, until Greer reached the "bottom" of the matter or received the truth from defendant. Toward the beginning of the interrogation, Detective Greer told defendant that if they didn't clear up the matter today, defendant would spend more time with Greer. A few minutes later Detective Greer told defendant not to lie or he would spend more time with Greer. After about 25 minutes, Detective Greer stated that he was not going to let defendant out of there until they got

4

to the bottom of the matter and that they were going to be there all night because Greer refused to let defendant lie to him. Only a minute later, however, Detective Greer told defendant that defendant could continue the interrogation tomorrow, it was up to him. The interrogation continued and there were numerous episodes of laughter which followed.

After approximately one hour and fifteen minutes, defendant was left alone to write a statement. Detective Greer then asked defendant to write answers to written questions from Greer. Defendant's statement indicated that he was at Fort Riley to burglarize houses because he needed money. Later, Detective Greer asked defendant if he knew anyone on the base. Defendant admitted that he knew Josh Webber and that Webber was involved in defendant's impending divorce. Detective Greer asked defendant to talk about Webber, his divorce, and his reasons for entering Fort Riley. Expressing displeasure with defendant's responses, Detective Greer told defendant that defendant was lying and had lied in his written statement. As he had mentioned several times previously, Greer indicated that lying to a federal officer was a felony for which one could go to jail. Just short of two hours into the interrogation, Detective Greer said words to the effect that when defendant got bunked with Big Bubba, defendant could explain to him why he played "fuck around" with Greer.

Approximately two and one-half hours into the interrogation,

defendant was left alone in the room to write another statement. In this statement, he admitted that he came to Fort Riley to hurt Josh Webber. Detective Greer returned at about 3:42 p.m. with another waiver of rights form. It was the same form which Officer Cosimini presented to defendant. Detective Greer wrote on the form that he wanted to question defendant about "Attempted Murder." He read through the form with defendant. When he reached the third statement regarding right to counsel, he only read the first part. This was the part which stated:

> "(*For personnel subject to the UCMJ*) I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a miliary lawyer detailed for me at no expense to me or both."

Detective Greer told defendant that he could not have a military lawyer since defendant was a civilian. Defendant initialed each statement on the form, including both parts of the third statement regarding the right to appointed counsel. Detective Greer asked defendant if he wanted a lawyer present. Defendant said "no." Detective Greer had defendant read the form aloud. Defendant read aloud statements 1, 2 and 4. He also read aloud the first part of statement 3: "I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government." Defendant also read aloud the parts of the form stating that he was willing to

discuss the offenses under investigation with or without a lawyer present and that he could stop answering questions at any time or speak privately with a lawyer before answering further. Defendant initialed and signed the form indicating that he was willing to make a statement without talking to a lawyer first and without having a lawyer present with him. He also read this statement aloud.

The questioning continued and defendant made written responses to written questions. At approximately 4:30 p.m., defendant read, signed and swore to the following statement:

> I, Ryan Peterson, have read or have had read to me this statement which begins on page 1, and ends on page 3. I fully understand the contents of the entire statement made by me. The statement is true. I have initialed all corrections and have initialed the bottom of each page containing the statement. I have made this statement freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.

The three pages are defendant's written statement and his written answers to questions. This statement indicated that defendant came to Fort Riley to hurt or kill Josh Webber.

From this point forward, there were more and much longer breaks in questioning where defendant sat alone in the interrogation room. Defendant received a fast food meal at about 6:30 p.m. He helped produce a timeline at the request of Detective Greer. At approximately 8:50 p.m., defendant wrote more answers to written questions from Detective Greer. Again, defendant signed

and swore to the truth of his answers and that the answers were made "freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement." Defendant again stated that he intended to stab Josh Webber.

Defendant was calm, rational and responsive during the interrogation. He did not ask for a break because he was tired or hungry. He received soft drinks while he was being questioned. Detective Greer interrupted the interrogation during the first hour to get some granola bars for defendant as soon as Greer learned that defendant had not eaten in some time. Defendant had two bathroom breaks. He did not appear confused. When defendant was alone in the room while the questioning was suspended, he appeared tired. He would stretch out in his chair or rest his head on the desk. But, defendant appeared alert when he answered questions.

### Miranda

Defendant makes two arguments for suppression of his statements. One of those arguments is that he was not properly advised of his Miranda rights.

When a Miranda violation is alleged, the burden of proof rests with the government to prove the validity of the waiver by a preponderance of the evidence. U.S. v. Johnson, 42 F.3d 1312, 1318 (10th Cir. 1994) cert. denied, 514 U.S. 1055 (1995). The court must determine:

> First, the relinquishment of the right [was] voluntary in the sense that it was a product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

Id., quoting U.S. v. Hernandez, 913 F.2d 1506, 1509 (10th Cir. 1990).

The court is convinced that defendant's waiver of his Miranda rights was voluntary and not the product of intimidation, coercion or deception. Officer Cosimini's testimony was clear and convincing that he carefully went over the written waiver with defendant. Defendant read the waiver, understood it, initialed each important element of the Miranda warnings, and voluntarily signed the waiver.

The closer question is whether defendant became confused regarding his Miranda rights after Detective Greer administered a second advisement of rights and did not orally inform defendant that he had the right to appointed counsel. "[T]he right to appointed counsel is a significant right which cannot be excluded from the advisement." U.S. v. DiGiacomo, 579 F.2d 1211, 1214 (10th Cir. 1978). In U.S. v. San Juan-Cruz, 314 F.3d 384, 387-88 (9th Cir. 2002), the Ninth Circuit held that conflicting instructions caused a faulty advisement of rights. There, a Mexican national arrested by the border patrol was advised of his administrative rights, which did not include the right to appointed counsel. Shortly thereafter, the arrestee was warned that he could be

9

charged with a criminal offense and read his Miranda rights, which did include the right to appointed counsel. The court held that the risk of confusion was substantial and that the government did not show that reading two sets of contradictory warnings under those circumstances adequately informed the defendant of his rights.

There was no evidence of confusion on defendant's part in this case. He had been through the waiver of rights thoroughly with Officer Cosimini. Detective Greer told him that this was the same form, which defendant could see for himself. Defendant initialed the essential parts of the Miranda warning, including the statement that he had the right to appointment of counsel on both forms. Defendant did not ask any questions about the form or otherwise exhibit confusion. A written advisement of Miranda rights is sufficient; it need not be given orally. U.S. v. Coleman, 524 F.2d 593, 594 (10th Cir. 1975). The court's job in this instance is to determine whether the warnings defendant received reasonably conveyed his rights as required by Miranda. Duckworth v. Egan, 492 U.S. 195, 203 (1989). The court finds that the written warnings read, initialed and signed by defendant adequately and reasonably conveyed defendant's Miranda rights and that defendant was not confused about his rights by the oral statements of Detective Greer. Therefore, the court finds that defendant knowingly and voluntarily waived his Miranda rights. See North Carolina v.

Butler, 441 U.S. 369, 373 (1979) (signing an express written waiver of the right to remain silent is usually strong, though not conclusive, proof of the validity of the waiver).

### Voluntariness of statement

Defendant's second argument for suppression is that his statements were not voluntary. The government has the burden of showing voluntariness by a preponderance of the evidence. U.S. v. Lopez, 437 F.3d 1059, 1063 (10th Cir. 2006). The question is whether:

> "'the confession [is] the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'"

U.S. v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993) (quoting Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)).  A number of factors are considered including the age, intelligence and education of defendant; the length of detention and questioning; the use or threat of physical punishment; whether Miranda safeguards were administered; the defendant's physical and mental characteristics; and the location of the interrogation. Perdue, 8 F.3d at 1466.

When he was interrogated, defendant was 29 years old, married with one child.  He appeared to have an average intelligence and to be in good health.  He may have been distraught regarding his arrest and the circumstances of his marriage.  But, he was calm and

lucid when answering questions. He did not lose emotional control. He read the Miranda warnings and indicated in writing that he knew his rights and consented to questioning. Defendant was alone in the room when he first wrote that he came down to Fort Riley to hurt Josh Webber. Prior to leaving the room, Detective Greer told defendant that if he came to Fort Riley to join the Boy Scouts, to write that, or if he came to stab Josh Webber, to write that. After making written statements and answers, defendant swore to those statements and stated that they were not made under coercion, threat or unlawful inducement. The officers who questioned defendant did not threaten him physically or attempt to "gang up" on defendant. Defendant was in a small room for a long time, approximately nine hours. But, the great majority of questioning occurred during the first three hours. Moreover, there were breaks during the first three hours of questioning and long breaks over the next six hours. Defendant may have been tired, but the evidence does not establish that his will was overcome by fatigue. See U.S. v. Toles, 297 F.3d 959, 965-66 (10th Cir. 2002) (lack of sleep in preceding 48 hours and interrogation inside a courthouse bathroom does not outweigh evidence of written waiver of rights and defendant's lucidity and responsiveness during questioning). The suggestion that defendant might receive more lenient treatment if he cooperated was not coercive. In U.S. v. Morris, 247 F.3d 1080, 1089-90 (10th Cir. 2001), the court affirmed a finding that it was

12

not an improper threat or promise of leniency for interrogators to present as a fact photos of criminals who did not cooperate and received long sentences along with photos of criminals who did cooperate and received lighter sentences. The court does not believe the interrogators in this case promised defendant leniency in return for making a statement or that they threatened him with harsh punishment.

Defendant was told not to lie and encouraged to speak the truth. This is not coercive in these circumstances. See Eidson v. Owens, 515 F.3d 1139, 1150 (10th Cir. 2008); U.S. v. Chalan, 812 F.2d 1302, 1308 (10th Cir. 1987) cert. denied, 488 U.S. 983 (1988); Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997) cert. denied, 522 U.S. 1130 (1998). Finally, the "Big Bubba" remark was certainly poor police practice. We do not believe, however, that the remark in conjunction with the other circumstances of the interrogation overcame defendant's free will and self-determination. The comment was isolated and intended to emphasize Detective Greer's point that defendant should not lie to him or he might be guilty of another offense. See U.S. v. Braxton, 112 F.3d 777, 782 (4th Cir.) cert. denied, 522 U.S. 874 (1997)(comments regarding the statutory penalty for making a false statement to a law enforcement officer and admonishments to "come clean" do not render suspect's statements involuntary). Defendant expressed no concern or questions regarding the comment.

Conclusion

In conclusion, upon careful review the court finds that the government has established by a preponderance of the evidence that defendant made a voluntary and informed waiver of his Miranda rights and that he made voluntary statements while under custodial interrogation. The motion to suppress shall be denied.

**IT IS SO ORDERED.**

Dated this 29th day of September, 2009 at Topeka, Kansas.

                                s/Richard D. Rogers
                                United States District Judge

14